**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

| | |
|---|---|
| **Depo IQ, Inc.**<br><br>Plaintiff,<br>v.<br>**Aonushka Aeron,**<br>Defendant. | CIVIL ACTION NO. 1:26-cv-2123<br>**JURY TRIAL DEMANDED** |

## Original Complaint

Plaintiff Depo IQ, Inc. ("DepoIQ") files this Original Complaint against Defendant Aonushka Aeron ("Aeron").

### I. SUMMARY

1. This lawsuit arises from Defendant Aeron's deliberate, coordinated, and malicious misappropriation of Plaintiff DepoIQ's trade secrets. Upon information and belief, Aeron misappropriated DepoIQ's trade secrets for the benefit of one or more third parties. Aeron, DepoIQ's former Head of AI, transferred confidential and proprietary data the same day she resigned and wiped her company computer in violation of her agreements with DepoIQ and Texas and federal law. DepoIQ brings this lawsuit to stop Aeron's continued misappropriation and exploitation of its trade secrets in the marketplace.

## II. PARTIES

2. Plaintiff DepoIQ is a Delaware corporation with its principal place of business in Las Vegas, Nevada.

3. Defendant Aonushka Aeron is a Canadian citizen believed to be domiciled in Ontario, Canada, and may be served with process at 6008 Grossbeak Dr, Mississauga, Ontario, L5N 5W8, Canada, or wherever she may be found.

## III. JURISDICTION AND VENUE

4. The Court has jurisdiction over this lawsuit pursuant to 28 U.S.C. § 1331 as this case concerns a federal question. The requirements of Section 1331 are met because Plaintiff's claims arise under the Defend Trade Secrets Act (18 U.S.C. § 1836) and the Computer Fraud and Abuse Act (18 U.S.C. § 1030).

5. The Court also has jurisdiction over this lawsuit pursuant to 28 U.S.C. § 1332(a)(2) because Plaintiff is a citizen of the United States and Defendant is a citizen of a foreign state, and the amount in controversy exceeds $75,000, excluding interest and costs but including reasonable attorney's fees.

6. The Court otherwise has supplemental jurisdiction over DepoIQ's state law claims pursuant to 28 U.S.C. § 1367 because those claims are so related to DepoIQ's federal claims that they form part of the same case or controversy under Article III of the United States Constitution.

7. The Court has personal jurisdiction over Aeron because she committed a tort that occurred in whole or in part in Texas. TEX. CIV. PRAC. & REM. CODE § 17.042.

8. Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this district.

## IV. BACKGROUND FACTS

### A. *DepoIQ provides a unique AI-powered platform to legal teams and legal service providers.*

9. DepoIQ is an AI-powered transcript and records intelligence platform that enables law firms, insurance carriers, Special Investigation Units ("SIU"), and other clients to analyze massive amounts of claim and litigation files in a matter of minutes. To do so, DepoIQ uses a one-of-a-kind multimodal artificial intelligence that has both a "semantic" AI, which can summarize, synthesize, and interpret data, and a "behavioral" AI, which analyzes human behavior.

10. Using this platform, clients can summarize files, review proposed deposition questions, and identify patterns and potential gaps in a party's evidence. With DepoIQ's proprietary behavioral AI, clients can also analyze a witness's verbal and non-verbal communication from deposition footage. In doing so, the behavioral AI extracts more than 30,000 different measurements to give insights into a witness's behavioral patterns and inconsistencies.

11. This multimodal behavioral AI is exclusive to DepoIQ and gives it a unique, competitive advantage in the marketplace.

12. In addition to this proprietary software, DepoIQ creates white-labeled solutions for third-party legal service providers like court-reporting companies. These white-labeled products allow companies to integrate DepoIQ's

AI solutions into their own platforms and to sell the product to customers under their own name and branding.

B. ***DepoIQ safeguards its client and company data.***

13. DepoIQ maintains rigorous security protocols to safeguard its trade secrets and its customers' confidential data. Specifically, DepoIQ maintains "zero data retention" agreements with the AI models that support its platforms. Under these agreements, client inputs and outputs are immediately deleted from the system and are not used to train either AI model.

14. Further, DepoIQ maintains System and Organization Controls ("SOC") 2 Type II compliance. As part of this process, a CPA firm audited DepoIQ and confirmed that DepoIQ's technological infrastructure, software, security personnel, security protocols and procedures, and data processing effectively safeguard client data.

15. To the extent DepoIQ shares or receives data with a client or potential client, it generally does so (1) upon execution of a nondisclosure agreement and (2) through encrypted file sharing applications.

16. Internally, DepoIQ password protects all its systems, which require a DepoIQ email login. Further, DepoIQ stores any internal files in an encrypted Google workspace. DepoIQ also requires personnel to complete security training.

17. Additionally, DepoIQ requires all its employees and contractors to execute Proprietary Information and Inventions Assignment Agreements ("PIIAA") as a condition of employment, which requires them to maintain the confidentiality of both DepoIQ's data and third-party data.

18. Since its founding in 2022, DepoIQ has invested over $1.8 million into developing its platform and AI solutions, obtaining security certifications, and maintaining regulatory compliance.

### C. ***As DepoIQ's Head of AI, Aeron signed contracts agreeing to keep DepoIQ's information confidential.***

19. On or about September 10, 2024, DepoIQ hired Aeron as its Head of AI. In this role, Aeron had special access to DepoIQ's confidential information. Specifically, she was responsible for leading and executing all AI-related projects at DepoIQ, formulating and executing the company's AI strategy with a primary focus on the legal and compliance industries, overseeing AI projects, developing and implementing AI models and algorithms tailored to the legal field, managing data pipelines, and leading AI teams. From September 10, 2024, to the time of her resignation, Aeron was domiciled in and worked for DepoIQ from Austin, Texas and worked in DepoIQ's Austin WeWork office.

20. Given Aeron's access to DepoIQ's and its customers' confidential information, on September 10, 2024, Aeron signed a Proprietary Information and Inventions Assignment Agreement ("PIIAA") as a condition of her employment, which is attached hereto as Exhibit A.

21. The PIIAA protects DepoIQ's "Inventions," which is defined as:

> [A]ny and all trade secrets, concepts, inventions, discoveries, mask works, ideas, processes, formulas, algorithms, software, innovations, source or object code, data, programs, applications, websites, research, experiments, assays, results, molecules, other works of authorship, know-how, improvements, discoveries, developments, designs and techniques and any other proprietary technology.

(PIIAA, "Inventions")

22. The PIIAA also protects "Confidential Information," which is defined as:

> [A]ny and all confidential knowledge, data or information of Company (tangible and intangible, written and oral, including any information contained or transmitted through any electronic medium), including without limitation, (a) Inventions and any information relating to any Inventions; (b) information regarding research, development, technical designs or plans, source code or software programs, applications, new products, marketing and selling, business plans, budgets and unpublished financial statements, licenses, prices and costs, margins, discounts, credit terms, pricing and billing policies, quoting procedures, methods of obtaining business, forecasts, future plans and potential strategies, financial projections and business strategies, operational plans, financing and capital-raising plans, activities and agreements, internal services and operational manuals, methods of conducting Company business, suppliers and supplier information, and purchasing; (b) any and all Inventions; (c) information regarding customers and potential customers of Company, including customer lists, names, representatives, their needs or desires with respect to the types of products or services offered by Company, proposals, bids, contracts and their contents and parties, the type and quantity of products and services provided or sought to be provided to customers and potential customers of Company and other non-public information relating to customers and potential customers; (d) information regarding any of Company's business partners and their services, including names, representatives, proposals, bids, contracts and their contents and parties, the type and quantity of products and services received by Company, and other non-public information relating to business partners; (e) information regarding personnel, employee lists, compensation, and employee skills; and (f) any other non-public information which a competitor of Company could use to the competitive disadvantage of Company.

(PIIAA, "Confidential Information")

23. Under the PIIAA, Aeron confirmed that, during and after her employment with DepoIQ, she would not disclose DepoIQ's Confidential Information, except (1) as may be required in connection with her work with DepoIQ or, (2) with express authorization from one of DepoIQ's officers. (PIIAA, ¶ 1.1.)

24. Aeron also agreed to keep Third Party Information confidential and to not disclose or use it, except in connection with her work with DepoIQ or as expressly authorized by a DepoIQ officer in writing. (PIIAA, ¶ 1.3.) "Third Party Information" is defined as "confidential and/or proprietary knowledge, data or information received from third parties." (PIIAA, "Third Party Information.")

25. Aeron also agreed to (1) return all materials disclosing or containing DepoIQ's Inventions, Confidential Information, or Third Party Information to DepoIQ after her employment ended, and (2) not copy, delete, or alter any information on her DepoIQ computer before she returned it to the company. (PIIAA, ¶ 7.) The PIIAA further required her to return any Confidential Information received, stored, reviewed, prepared, or transmitted on her personal computer, systems, or email and to permanently delete and expunge all Confidential Information after providing DepoIQ with a computer-useable copy. (*Id.*)

### D. ***Aeron steals DepoIQ's Confidential Information, Inventions, and trade secrets.***

26. On March 5, 2026, Aeron submitted her resignation from her position as Head of AI from DepoIQ's Austin, Texas WeWork office, effective March 15, 2026. Just a few minutes prior, DepoIQ received a resignation letter from Aeron's husband and its Chief Technology Officer, Miltiadis Saratzidis ("Saratzidis").

27. Pursuant to the parties' agreements, on March 12, 2026, Aeron mailed her DepoIQ computer to DepoIQ headquarters. John Sanchez, DepoIQ's CEO, requested Saratzidis's and Aeron's username and password. Saratzidis

provided an incorrect password for his laptop. After multiple attempts to contact Saratzidis via WhatsApp, phone, and email regarding the incorrect password, Saratzidis finally provided the correct password almost a month later on April 4, 2026. DepoIQ then discovered that Saratzidis and Aeron had completely erased both computers and on information and belief had transferred the data to another computer or storage device.

28. Due to the suspicious and coordinated nature of Saratzidis's and Aeron's resignations, DepoIQ investigated the couple's Google Workspace activity logs. It discovered that, around the time of their resignation, Aeron shared twenty-two unique files externally from her DepoIQ account, fifteen of which were shared with her personal email addresses. These files include, but are not limited to:

- Internal product requirements, including for a product DepoIQ was developing for its largest customer;
- A competitive analysis between DepoIQ and a competitor;
- Internal PowerPoints explaining DepoIQ's multimodal AI; and
- Prospective customer file analyses and spreadsheets with third-party branding.

29. DepoIQ also reviewed Saratzidis's DepoIQ-funded ChatGPT and Claude account histories and discovered that Saratzidis inquired about a data transfer failure between Aeron's DepoIQ computer and her personal computer.

30. DepoIQ hired a forensic examiner to image Saratzidis's and Aeron's laptops, attempt to recover deleted files, and to determine if the couple had emailed or transferred any other confidential DepoIQ files. Significantly, the forensic examiner discovered that Saratzidis and Aeron subjected their computers

to a complete operating system erasure and reinstallation on March 11, 2026, rendering all user files, email data, browser history, and all other data permanently and irrevocably lost. The forensic examiner determined that the nearly simultaneous creation of new user accounts on both devices, separated by approximately five minutes, supports the conclusion that the erasures were part of a coordinated and deliberate process.

31. Due to Aeron's deliberate data erasure, DepoIQ has not yet determined the extent to which she exfiltrated DepoIQ's and its customers' confidential and proprietary information.

32. Upon information and belief, Aeron maintains possession over DepoIQ's misappropriated trade secrets in violation of her agreements and Texas and federal law and for the benefit of one or more third parties.

## V. CAUSES OF ACTION

### A. *Count 1— Violation of the Defend Trade Secrets Act (18 U.S.C. § 1836)*

33. DepoIQ realleges and incorporates by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

34. Aeron has misappropriated and continues to misappropriate DepoIQ's confidential information including trade secrets related to products used and intended for use in interstate commerce in violation of 18 U.S.C. §§ 1836-39 (hereinafter "the Defend Trade Secrets Act" or "DTSA"). DepoIQ's confidential business information currently in Aeron's possession, custody, or control, including without limitation DepoIQ's internal product requirements, competitive analyses, and proprietary AI documentation ("DepoIQ's Trade Secret

Information”), is entitled to trade secret protection under federal law. *See* 18 U.S.C. § 1839(3). As set forth above, DepoIQ is the owner of these trade secrets.

35. DepoIQ’s Trade Secret Information includes financial, business, scientific, technical, economic, and/or engineering information, including plans, compilations, formulas, designs, methods, techniques, processes, procedures, programs, or codes, both tangible and intangible.

36. As set forth above, DepoIQ has taken reasonable measures to keep DepoIQ’s Trade Secret Information secret, including, for example, maintaining written employment and contractor policies containing confidentiality and security restrictions, requiring all employees and contractors to sign a PIIAA, implementing physical access restrictions, and implementing computer network restrictions.

37. DepoIQ’s Trade Secret Information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information. DepoIQ’s Trade Secret Information has actual and/or potential independent value because, for example, this information is not generally known to DepoIQ’s competitors and other persons in the legal AI industry who could obtain economic value from its use or disclosure. Nor was or is such information readily ascertainable to such persons by proper means.

38. Aeron has misappropriated DepoIQ’s trade secrets by acquiring DepoIQ’s Trade Secret Information while knowing or having reason to know that she acquired such information by improper means. Such acquisition by improper

means includes sharing DepoIQ's files to her personal email address and, on information and belief, Aeron's creation of unauthorized copies of DepoIQ's Trade Secret Information after Aeron's employment with DepoIQ ended, constituting theft and/or breach of Aeron's duty to maintain the secrecy of such information.

39. Upon information and belief, Aeron has also misappropriated DepoIQ's trade secrets by, without DepoIQ's express or implied consent, disclosing and/or using DepoIQ's Trade Secret Information, including, for example, by providing DepoIQ's trade secrets to one or more third parties to develop products for DepoIQ's actual or potential competitors.

40. As further set forth above, as former Head of AI of DepoIQ, Aeron knew or had reason to know at the time of her unauthorized disclosure and use of DepoIQ's Trade Secret Information that the knowledge of such information was acquired under circumstances giving rise to a duty to maintain the secrecy of DepoIQ's Trade Secret Information or limit the use of such information.

41. At the time of Aeron's misappropriation, she was aware of DepoIQ's employment and post-termination policies with regard to DepoIQ's confidential business information and trade secrets. Aeron signed a PIIAA agreement regarding the post-termination obligations and duties of current and former DepoIQ employees and contractors. DepoIQ has not provided Aeron with any express or implied authorization to continue to possess or utilize its confidential business information after Aeron's employment ended on March 5, 2026.

42. Aeron's actions are willful and malicious. Upon her resignation from DepoIQ, Aeron deliberately destroyed all of the data on her DepoIQ work laptop before returning the laptop to DepoIQ. At the same time, upon information and

belief, Aeron secretly retained one or more electronic copies of at least some of the very information she destroyed, including DepoIQ's Trade Secret Information.

43. DepoIQ is entitled to preliminary and permanent injunctive relief under the DTSA, enjoining Aeron's actual or threatened misappropriation of DepoIQ's trade secrets. DepoIQ seeks injunctive relief (1) compelling Aeron to return to DepoIQ any and all DepoIQ Trade Secret Information that is in Aeron's possession, custody, or control, including without limitation any and all DepoIQ equipment or property containing such information; (2) compelling Aeron to then securely delete any and all copies of DepoIQ's Trade Secret Information remaining in Aeron's possession, custody, or control in a pre-approved, forensically-sound manner, and permitting DepoIQ to confirm that all such information has been securely deleted; and (3) preventing Aeron from disclosing or using any DepoIQ Trade Secret Information learned by Aeron during her employment for any purpose.

44. Under the DTSA, DepoIQ is entitled to and seeks damages for actual loss caused by Aeron's misappropriation. DepoIQ is also entitled to and seeks damages for Aeron's unjust enrichment caused by the misappropriation. Further, DepoIQ is entitled to and seeks exemplary damages for Aeron's willful and malicious misappropriation of DepoIQ's trade secrets.

45. DepoIQ is also entitled to recover and seeks its reasonable attorneys' fees due to Aeron's willful and malicious misappropriation of DepoIQ's trade secrets.

### B. *Count 2— Violation of the Texas Uniform Trade Secrets Act (Tex. Civ. Prac. & Rem. Code § 134A.001)*

46. DepoIQ realleges and incorporates by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

47. Aeron has misappropriated DepoIQ's confidential information including trade secrets in violation of TEX. CIV. PRAC. & REM. CODE § 134A.001 *et seq*. (hereinafter "The Texas Uniform Trade Secrets Act" or "TUTSA"). DepoIQ's confidential business information currently in Aeron's possession, custody, or control, including without limitation DepoIQ's Trade Secret Information, is entitled to protection as trade secrets under TUTSA. As set forth above, DepoIQ is the owner of DepoIQ's Trade Secret Information.

48. DepoIQ's Trade Secret Information includes business, scientific, technical, engineering information, and patterns, plans, compilations, methods, techniques, processes, and procedures.

49. DepoIQ's Trade Secret Information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use. DepoIQ's Trade Secret Information has actual and/or potential independent value because, for example, this information is not generally known to DepoIQ's competitors and other persons in the legal AI industry who could obtain economic value from its use or disclosure. Nor was or is such information readily ascertainable to such persons by proper means.

50. As set forth above, DepoIQ has taken reasonable measures to keep DepoIQ's Trade Secret Information secret, including, for example, maintaining

written employment and contractor policies containing confidentiality and security restrictions, requiring all employees and contractors to sign a PIIAA, implementing physical access restrictions, and implementing computer network restrictions.

51. Aeron has misappropriated DepoIQ's trade secrets by acquiring DepoIQ's Trade Secret Information while knowing or having reason to know that she acquired such information by improper means. Such acquisition by improper means includes sharing DepoIQ's files to her personal email address and, on information and belief, Aeron's creation of unauthorized copies of DepoIQ's Trade Secret Information after Aeron's employment with DepoIQ ended, constituting theft and/or breach of Aeron's duty to maintain the secrecy of such information.

52. Upon information and belief, Aeron has also misappropriated DepoIQ's trade secrets by, without DepoIQ's express or implied consent, disclosing and/or using DepoIQ's Trade Secret Information, including, for example, by providing DepoIQ's trade secrets to one or more third parties to develop products for DepoIQ's actual or potential competitors.

53. As further set forth above, as former Head of AI of DepoIQ, Aeron knew or had reason to know at the time of her unauthorized disclosure and use of DepoIQ's Trade Secret Information that the knowledge of such information was acquired under circumstances giving rise to a duty to maintain the secrecy of DepoIQ's Trade Secret Information or limit the use of such information.

54. At the time of Aeron's misappropriation, she was aware of DepoIQ's employment and post-termination policies with regard to DepoIQ's confidential business information and trade secrets. Aeron signed a PIIAA regarding the post-

termination obligations and duties of current and former DepoIQ employees and contractors. DepoIQ has not provided Aeron with any express or implied authorization to continue to possess or utilize its confidential business information after Aeron's employment ended on March 5, 2026.

55. Aeron's actions are willful and malicious. Upon her resignation from DepoIQ, Aeron deliberately destroyed all of the data on her DepoIQ work laptop before returning the laptop to DepoIQ. At the same time, upon information and belief, Aeron secretly retained one or more electronic copies of at least some of the very information she destroyed, including DepoIQ's Trade Secret Information.

56. DepoIQ is entitled to preliminary and permanent injunctive relief under TUTSA, enjoining Aeron's actual or threatened misappropriation of DepoIQ's trade secrets. DepoIQ seeks injunctive relief (1) compelling Aeron to return to DepoIQ any and all DepoIQ Trade Secret Information that is in Aeron's possession, custody, or control, including without limitation any and all DepoIQ equipment or property containing such information; (2) compelling Aeron to then securely delete any and all copies of DepoIQ's Trade Secret Information remaining in Aeron's possession, custody, or control in a pre-approved, forensically-sound manner, and permitting DepoIQ to confirm that all such information has been securely deleted; and (3) preventing Aeron from disclosing or using any DepoIQ Trade Secret Information learned by Aeron during her employment for any purpose.

57. Under TUTSA, DepoIQ is entitled to and seeks damages for actual loss caused by Aeron's misappropriation. DepoIQ is also entitled to and seeks damages for Aeron's unjust enrichment caused by the misappropriation. Further,

DepoIQ is entitled to and seeks exemplary damages for Aeron's willful and malicious misappropriation of DepoIQ's trade secrets.

58. DepoIQ is also entitled to recover and seeks its reasonable attorneys' fees due to Aeron's willful and malicious misappropriation of DepoIQ's trade secrets.

### C. ***Count 3— Violation of the Computer Fraud and Abuse Act (18 U.S.C. § 1030)***

59. DepoIQ realleges and incorporates by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

60. Aeron sent DepoIQ's Trade Secret Information to her private email address and wiped DepoIQ's company computer without authorization in violation of 18 U.S.C. §§ 1030(a)(2)(C) and 1030(a)(5).

61. Aeron violated Section 1030(a)(2)(C) by (1) intentionally accessing a computer; (2) exceeding her authorized access; (3) thereby obtaining information; (4) from any protected computer.

62. DepoIQ uses security safeguards to ensure that access to the information on its computer systems is restricted to authorized individuals acting within the scope of their authority. Pursuant to the PIIAA between DepoIQ and Aeron, Aeron was aware that she was not authorized to transfer DepoIQ's Trade Secret Information or Third Party Information to her personal email address and to retain them post-employment.

63. Aeron violated Section 1030(a)(5) by (1) knowingly causing the transmission of a program, information, code, or command; and (2) as a result of

such conduct; (3) intentionally causing damage; (4) without authorization; (5) to a protected computer.

64. Through the PIIAA, Aeron was aware that all information on her DepoIQ computer belonged to DepoIQ, and that she was obligated to return all data upon her departure and was not authorized to delete or alter any information on her computer before returning it to the company. (PIIAA, ¶ 7). Yet, Aeron knowingly wiped the computer prior to returning it to DepoIQ.

65. Aeron's company-issued computer device is a "protected computer" within the meaning of the statute because it is used in or affects interstate commerce or communication as part of DepoIQ's business operations.

66. As a direct and proximate result of such conduct, DepoIQ has suffered, and will continue to suffer damages. DepoIQ seeks and is entitled to compensatory damages, including without limitation damages caused by or resulting from impairment to the availability of data, programs, systems, or information.

### D. ***Count 4— Violation of Tex. Penal Code § 33.02***[1]

67. DepoIQ realleges and incorporates by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

68. Aeron also wiped her DepoIQ computer in violation of TEX. PENAL CODE § 33.02.

69. Aeron violated TEX. PENAL CODE § 33.02(b-1) by (1) knowingly accessing DepoIQ's computer; (2) with the intent to alter, damage, or delete

[1] TEX. CIV. PRAC. & REM. CODE § 143.001 provides a private cause of action to persons whose property has been injured because of a violation of Chapter 33 of the Texas Penal Code.

property; (3) in violation of her PIIAA to which she expressly agreed; (4) with the intent to use a file, data, or proprietary information stored in the computer; or (5) with the intent to alter, damage, or delete property.

70. Aeron knowingly accessed her computer with the intent to wipe its data and with the intent to use the proprietary data therein, which violated paragraph 7 of her PIIAA that expressly prohibits Aeron from deleting information from her DepoIQ computer.

71. Under TEX. CIV. PRAC. & REM. CODE § 143.002, DepoIQ is entitled to and seeks damages for actual loss caused by Aeron wiping DepoIQ's computer. Further, DepoIQ is entitled to and seeks exemplary damages for Aeron's willful and malicious wiping of DepoIQ's computer.

72. DepoIQ is also entitled to recover and seeks its reasonable attorneys' fees due to Aeron's knowing and intentional misappropriation of DepoIQ's trade secrets and wiping DepoIQ's computer.

E. ***Count 5— Breach of PIIAA***

73. DepoIQ realleges and incorporates by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

74. The PIIAA is a valid and enforceable contract.

75. DepoIQ is a proper party to bring suit for breach of the PIIAA.

76. DepoIQ performed, tendered performance of, or was excused from performing its contractual obligations.

77. Aeron breached her PIIAA by, among other things: retaining DepoIQ's Trade Secret Information after her departure, retaining Third Party

Information after her departure, and wiping her DepoIQ computer before returning it.

78. Aeron's breach of the PIIAA caused DepoIQ injury, including actual and consequential damages for loss caused by Aeron's misappropriation of trade secrets and Third Party Information and wiping her computer.

79. DepoIQ also seeks recovery of reasonable and necessary attorneys' fees pursuant to TEX. CIV. PRAC. & REM. CODE § 38.001.

## VI. Jury Demand

Plaintiff demands a trial by jury on all issues triable by a jury.

## VII. CONCLUSION

For these reasons, Plaintiff DepoIQ respectfully requests that the Court enter judgment in its favor and award the following relief:

- preliminary and permanent injunctive relief compelling Aeron to return all DepoIQ Trade Secret Information, Confidential Information, and property in her possession, custody, or control;
- an order compelling Aeron to securely delete all copies of DepoIQ's Trade Secret Information and Confidential Information in a forensically-sound manner, with DepoIQ permitted to confirm secure deletion;
- an order enjoining Aeron from disclosing or using any DepoIQ Trade Secret Information or Confidential Information for any purpose;
- actual and compensatory damages for DepoIQ's losses caused by Aeron's misconduct;
- exemplary damages for Aeron's willful and malicious conduct;

- reasonable and necessary attorneys' fees;
- costs of suit; and
- all other relief, legal and equitable, to which DepoIQ may show itself entitled.

Dated: July 30, 2026

Respectfully submitted,

*/s/ Mark C. Howland*

Mark C. Howland (MHowland@CCSB.com)
State Bar No. 24027240
Signature on file with the U.S. District Clerk
Alex More (amore@ccsb.com)
State Bar No. 24065789
CARRINGTON, COLEMAN, SLOMAN & BLUMENTHAL, L.L.P.
2200 Ross Ave
Suite 1800
Dallas, TX 75201
214-855-3000
214-580-2641 (facsimile)

**Attorneys for Plaintiff DepoIQ, Inc.**